Counsel, ready to proceed? Yes. You may do so. Thank you. May it please the Court, Catherine Felton for Appellant Federal Resources Corporation. I'd like to reserve five minutes. There are two issues before this Court on appeal. The first is whether the Court erred in determining that evidence of historical insurance held by the predecessor to Coeur d'Alene's company was irrelevant to determining the adequacy and fairness of an ability-to-pay consent decree under CERCLA. The second is whether the Court erred in determining that no comparative fault analysis was required in support of the consent decree. And I'll address the insurance issue first. The United States bears the burden to establish and bring forward sufficient evidence to the District Court to establish that the consent decree it is offering is fair, reasonable, and consistent with the principles of CERCLA. In the evidence on this case, in this case, the Court failed to investigate historical insurance assets held by the predecessor to Coeur d'Alene's company, the party it was settling with, and that party was claiming to be unable to pay its full share of liability at the site. This evidence, which was located by Federal Resources Corporation. What more should they have done? I mean, they did review the accounts of the party that you're questioning here, and they looked at everything. They had an expert, I think, sort of auditor do the review, and they determined that there really wasn't anything there. There may have been some general insurance, but not specific insurance. And then there was an agreement that if they had any insurance that was found out later, they'd be willing to give up those the proceeds from that insurance. I'm trying to figure out what exactly was deficient or problematic with that. Okay, I think there's two components to the question that you ask, and the first one I'll address relates to the review that Joan Meyer did on behalf of the United States. That's the expert to which you're referring. Joan Meyer submitted an affidavit designating, identifying the work that she did in evaluating the ability to pay status of Coeur d'Alene's company. What she reviewed was their current incomes. They're a metal fabricating company, the current form of Coeur d'Alene's company is. She reviewed their current income, their net worth. She also reviewed their balance sheets to determine if there were any superfluous, unnecessary assets which they could liquidate to offer up additional money in settlement. And finally, she looked at whether the company in its current state could take on additional debt in order to satisfy the liability. She included an exhibit to her declaration which listed the documents that she reviewed. With only one exception, all those documents are from 2000 or 1998 forward. They're essentially current documents relating to the state of the industry that Coeur d'Alene's is practicing in, and to its own current financial affairs. The word insurance does not appear in her declaration or in the list of the materials that she reviewed. There is a general reference to the Coeur d'Alene's company's historical financial history from 1911 through 2014. What's important about this is that not only does this not identify specifically that she looked at insurance, but that the Coeur d'Alene's company started in the early 1900s, approximately 1911 I believe. It has engaged in its metal fabrication business since that time. It was not until 1993 that Conjecture Mines Inc., which was formerly Conjecture Inc., which was the successor to Funnel and Major Mining Company, merged with Coeur d'Alene's company. In that merger, the surviving entity was actually Conjecture Inc., but it renamed itself Coeur d'Alene's company, and it took on the business operations of Coeur d'Alene's company. What is apparent from Joan Meyer's declaration and her exhibit is that what she appears to have looked at is the financial history of Coeur d'Alene's company, not of the financial history of Conjecture Mines Inc., Conjecture Inc., and importantly, the left-off predecessor, Funnel and Major Mining Company. Now, to address... What incentive would the United States or CDA have to hide the existence of a valid insurance policy that might go towards covering this liability? Right. Well, Marilyn Schrader, the CFO for Coeur d'Alene's company, submitted an affidavit stating that they simply didn't have records from Funnel and Major Mining Company. It was too far back in time. She also said that they had some form of an insurance review. However, there's no evidence in the record as to who this person is, what they did, whether they were able or why they were unable to identify that Funnel and Major was an additional predecessor. I don't think you've answered my question. You're right. I haven't gotten there. I was maybe doing too much of a preamble. I believe that there's no evidence that they're actively trying to hide the historical insurance. The problem here is that the government didn't find it in its own records before Federal Resources provided it. However, Federal Resources provided it before the government lodged the consent decree. When you say provided it, provided what? Provided the historical records showing that there were references to liability insurance of Funnel and Major Mining Company in the early 50s. It identified a Liberty National Insurance Company. Federal Resources actually undertook to become in the modern era, and it identified three potential insurance companies. Federal Resources provided this information to the Coeur d'Alene's Companies Council and said, you need to tender this. You have not pursued this insurance. It's clear that you didn't undertake this analysis before the consent decree was lodged, even though we had provided the documentation. And Coeur d'Alene's Company refused to do that. Now why they would refuse to do this, I honestly can't tell you. Why the United States wouldn't look at this, I similarly can't tell you, because they have never explained this adequately. What I can share... But, you know, there is at least some indication in the Schroeder, right, affidavit that there was an investigation into insurance and into liability insurance. Now you're right, you know, they don't identify the name of an expert, and the conclusion reaches that there's nothing wrong now. I don't think anybody involved in this, including the United States, would have any interest in overlooking possible liability insurance, would they? There's no motive to do that. What are you saying, they were just careless? I'm saying that they were unaware of it, but when they were made aware of it... Well, they were unaware of it because they had the Schroeder affidavit. Well, the Schroeder affidavit actually says that the only insurance review related to Conjecture Mines Inc. and Conjecture Inc. It didn't relate to Funnel and Major Mines. Related to workers' compensation or something like that. But, I mean, they had this, you know, representation that there was an investigation into the Funnel and Major's, I'll call it insurance history, right? No, no, Your Honor. Marilyn Schroeder did not make that testimony. Her testimony is limited to saying that they employed somebody to do some form of a search, again, unknown. The court didn't even have the benefit of knowing exactly what this person, whomever they are, did. So... I'm not sure what your case is, but first, let me ask you this. So what is our standard of review when we look at this? It's abuse of discretion, Your Honor. Courts have held that entry of CERCLA consent decrees are reviewed for abuse of discretion. And there's a double deference here, though, isn't there? I mean, there's a deference that the district court has to give to the United States, and then there's a deference we have to give to the district court in these kind of cases. So you have to overcome a double deference, and I'm not sure pointing to, and I'm curious, but, you know, looking at these sort of pieces of historical evidence that CDA might have additional coverage or, you know, is enough to say to overcome this significant deference we have to give. I think it gets at the heart of an ATP party. This party has come saying they can't pay their share of liability. And the United States has guidance documents on evaluating when folks come to them and say, I just can't pay. And there's nothing wrong with having an ATP structure for parties who can't pay. It's laudable. It's necessary. Parties shouldn't be put out of business because they can't pay their CERCLA liability. However, that policy, that guidance document, specifically instructs that evidence of insurance is to be evaluated and other evidence of sources of money that wouldn't be directly coming from the party, but from a party who is required to step forward in the shoes of the party who's claiming ATP status. You're saying there was clear error here by the district court? Because, I mean, we have to look at what the district court decided, and there was an evaluation. You may not be happy with the type of evaluation, but was it clearly erroneous? Your Honor, I believe it was. It was. The historical documents, they were the United States' business documents. Now, it has a lot of documents. I can understand how it maybe didn't find them. Do you have any authority besides your – and I asked you for your belief, but you gave me your belief. Do you have any authority? Is there any other case law to support you on this? That not investigating insurance is a fundamental error? Anything commensurate to this. I have not found any case where a court was presented with evidence of insurance that had not been at least investigated to determine if it was viable, and the party still sought a consent decree. This is a unique circumstance. I don't – I've never found another case. Well, but here – the reason it may be – I mean, here the court did attempt to evaluate and review the insurance, and apparently, you know, reviewed the expert who reviewed it. I don't think it went to your satisfaction in going to the other companies, but I'm not sure that we'd say that this was such a significant departure from what normally happens. I mean, it seems like this is the norm. Do you have any idea of, you know, how much coverage there was that was bypassed? Your Honor – You don't know, do you? I don't know, and in fact, federal resources cannot, under Idaho law, pursue these claims. It has no direct third-party action. So we couldn't tender – we can't sue them and try to stand in the shoes. What did you – what did you tender to the court as, I'll say, you know, sufficient indication that the decree shouldn't have been approved? Well, we submitted the evidence of the historical insurance. Well, I know, but what is that, just that you think some insurance existed? Oh, no, no. These are historical documents from the 1950s. They're actually reports, audit reports that the government did when it was engaged in mining activities with Funnel & Major. There was a joint mining project going on under which the government provided funding to Funnel & Major. Funnel & Major had to provide reports, not only monthly reports, but it got audited as to what it was doing with these funds. In those reports, there are requirements that they designate their insurance premiums. There's also references specifically to liability insurance in the audit reports. But that could possibly be a workers' compensation liability, right? Your Honors, it says liability insurance. We can't know it, and they didn't investigate it. It's entirely possible this insurance may lead nowhere, but that's not the issue. The issue is that it was never investigated, unless you look. And we're not saying that at the end of the day you couldn't have an ATP settlement. Well, it's a background issue. If you know it's not going to go anywhere, you know, it's not prejudicial, right? I'm not saying it's not going anywhere. No, you don't know. That's my question. Do we know whether it's going to go anywhere or not? No, and I don't believe that Coeur d'Alene's company could tell you that it's going nowhere. I don't believe they could stand up here and say that, because what they've told us is they've refused to tender it. And the government has similarly not conducted a review of it. Did you say refused to tender it? It refused to send tender letters to the insurer. To whom? To the insurer. You had the names of the insurers? We had the name. We had researched the modern successor to the liability insurance company that was named in the report. And we actually drafted, highly unusual, for another party to provide a tender letter and say, hey, we've done this research. This is important. We don't know why you haven't done it, but please tender this to your insurance company. Well, what was the reason for declining to make, you know, make the tender? They claimed that they had no belief that they were the successor to Funnel and Major. However, there's ample documents in the record to show that, in fact, they were. The only evidence in the record is from their own lawyer repeatedly acting on behalf of Funnel and Major. So you made this argument to the district court? Yes, Your Honor, we did. Okay. Thank you. Did you want to reserve your time? I did. I'll reserve the last 45 seconds. Thank you. Thank you. May it please the Court, Your Honors. My name is Peter Krzwicki, and I represent the United States of America. At counsel table with me is Christopher Puser. He represents the Coeur d'Alene's company. I would like to split the time with him. I will take the first 10 minutes of the time allowed. We'll take the remaining five if that's agreeable. That's agreeable. Thank you. The district court correctly entered the consent decree between the United States and Coeur d'Alene's company in this case because it's fair, reasonable, and consistent with the purposes of CERC law. Let me ask you a question on that. Montreux says the district court has to make sure that the settlement's fair. How can you make a meaningful assessment of the settlement being fair, having no idea of the proportionate liability of the settling party? Your Honor, because unlike the Montreux case, in this case there was an ability to pay determination that was made, and so the finances provide you the ability to assess whether or not the best deal possible is being made. I totally agree, and I recognize it's a significant factor. Maybe at the end of the day it might be a dispositive factor. But the standard for the district court is, is this settlement fair? If you're the district court reviewing a settlement and there's a great disparity between what someone's going to be paying and what their liability is, I'm going to look at the showing a little bit more carefully to make sure it's fair, as opposed if the disparity is, let's just say, a few hundred thousand dollars on a million-dollar settlement, maybe I'm not going to be as intense in my scrutiny and review, realizing it's double deference. But I guess my question to you again is, I get the ability to pay. It's an important factor. I get the idea of double deference. But how can you make a fairness assessment when you don't have the key component of proportionate liability, which Montrose said was one of the key factors? Your Honor, respectfully, we disagree that that's the key component in this situation. Now, and I admit, in most situations it will be, because you'll be able to look at a party's comparative fault and then make some sort of calculation relative to their comparative fault, because you're assuming in that instance, as was the case in Montrose, that these parties could pay whatever their share is. Well, you're really minimizing then the district court's review. I mean, I'm not saying you're turning the district court into a potted plant, but basically, take my word for it, Judge, they don't have the ability to pay. And so your analysis is over. Your Honor, again, I would disagree with that. I think that the district court could certainly review all of the financial information that was the basis of this ability to pay issue, and were it and had, you know, opposing counsel so moved, there might be a situation where you could envision a protective order and both parties disputing what the financial information really means. Now, we had an expert who has had. I would give, I mean, I concede that in my questions to you. I concede that the government's going to make an assessment on ability to pay, but still, don't you have to compare it to something? I just feel like you have an equation here. You've got to look at some key components to make this fairness assessment, and without that one key component, I don't see how you can make a fairness assessment. Your Honors, the government's position is that in this narrow set of circumstances where we have an ability to pay determination, that assessment isn't absolutely necessary, and we also would point out that this isn't fairness in the sort of abstract context that might exist in other statutes. This is fairness in the context of a statute that emphasizes early settlement, in fact, directs the United States to facilitate settlement in order to minimize litigation, and as the First Circuit held in the Cannons case, acknowledges that non-settlers are going to bear a risk of disproportionate liability by not settling with the government. I would argue that that's even more of a reason why the district court needs to know what's the proportionate liability, because you're going to be letting someone get off maybe with the deal of the century because that's all they can pay, and then the other PRPers are going to be held to a multimillion-dollar price tag. A lot of these Superfund sites, we're not talking about millions of dollars, we're talking about hundreds of millions and billions of dollars. So, first of all, the opposing counsel has just admitted they don't challenge this policy, and they conceded as much in their reply brief as well. Second of all, I think that the point is that in this case the question, I mean, you know, the United States has already cleaned up, and so there's also an issue of who has unclean hands, and so it's not as though this liability would just get, you know, borne by no one. Eventually it would fall back on the taxpayers, and that's the thing that Congress was really seeking to avoid, both when it created joint and several liability, and when it modified CERC law to encourage early settlements. But what's so difficult about just putting together a preliminary estimate? Why are you so hesitant that that can't be provided to the district court? Your Honors, in each case, I mean, it's going to be a case-specific issue, and it's going to depend upon what's going on in each individual case. Some cases there may be a ready way to figure out the shares, but this case actually illustrates exactly the complication in that. It's undisputed that Coeur d'Alene's owned the site for an extended period of time, but it wasn't the operator of the site for much, if any, of that time. And so how do you determine what is the apportionment of their liability in that situation? It becomes extremely complex, which is why... It is, and it's usually pretty subjective at the end of the day. You do it on years of operation, but no one's going to be able to determine who did this much contamination to the groundwater. I get that, but it's done all the time. You have to give some sort of estimate. The other thing I think it's important to realize, and yes, Your Honor, it is done, but it's often done at great expense. And again, that great expense oftentimes would actually end up being borne by a third party who isn't settling, but it depends upon whether or not, obviously, the United States succeeds in finding Jordan several liability against them. Well, I mean, the short of it is your position is there's like a... You can't squeeze blood out of a turnip, exception to the Montrose rule, right? And when it comes down to it, you don't want to do it because it's not going to be productive. Yes, Your Honor. So then it all depends on the point your opponent is challenging as to how diligent your inquiry into the financial ability of CDA was, right? Yes, Your Honor. And let me ask you, first of all, what's your response to this argument about, well, you didn't even require CDA to make a tender? So, Your Honors, I don't know that it is in our power to require... Well, you could not approve the settlement. Yes, Your Honor. However, first of all, I would like to point out that we don't concede that we were on notice as to the insurance issue until well into this case after we lodged the proposed consent decree. The issue that they point to is that in their parallel case, they submitted a document that argued that the United States had a ranger liability and then provided hyperlinks to literally 493 pages of United States geological survey data and discussion. In a handful of those pages, there is some reference to insurance, but we were focused when we received that information on defending the United States's... in regards to a ranger liability, and were not aware until after the consent decree was lodged that this was an issue at all. I would also point out that the... So at that point, you decided to stonewall it, right? But I would also point out that the United States, even after having reviewed these documents, is under no impression that relevant insurance exists, and this is for several reasons. We don't acknowledge that Funnel & Major is the corporate predecessor in any relevant sense to Conjecture Minds Incorporated. We don't acknowledge in our review of the documents that relevant insurance existed. As best we can tell, workman's compensation insurance existed. And both of these factors go to the fact that there wasn't... we, after reviewing these documents, didn't find any need to further investigate insurance. And I would like to make one other point clear. That is that Marilyn Schroeder, the chief financial officer of Coeur d'Alene's, stated that she turned over the insurance investigation information to the United States. Now, part of the problem is that much of this investigation involved confidential business information of Coeur d'Alene's, and the United States has taken the position that it won't turn that over unless a court orders it to do so. And so there is... the record doesn't abound with all of the information that happened, but they told us that there was no relevant insurance and that their expert came up with no such relevant insurance. So we had... and we had a consent decree in place that would... that we could reopen if any inaccurate information were provided to us by them that gave us ample assurance that there wasn't any insurance information that we were missing. Your Honors, at this point I've used up 10 minutes, and I would like to reserve the remainder of the time. The United States rests. A little more than 10. May it please the Court, I'm Christopher Pouza representing the Coeur d'Alene's Company. Like the United States, Coeur d'Alene's is asking the Court to affirm the District Court's approval of the consent decree. When the United States first approached Coeur d'Alene's about its potential liability for the conjecture mine site, it asked the United States to consider its limitability of pay. Can you speak up? Yes, I'm sorry. When the United States first approached Coeur d'Alene's, Coeur d'Alene's asked them to consider its limitability to pay, and it did so because Coeur d'Alene's is a small, privately held company, and it has limited financial resources. And that was borne out by the investigation done by the United States financial expert, Dr. Meyer. And she considered what was going to be the financial impact to Coeur d'Alene's. It is true, isn't it, that she didn't look into insurance at all? So she was relying on information that was requested by the United States of Coeur d'Alene's, and Coeur d'Alene's responded to that information. Part of the information that was requested by the United States was information with respect to insurance coverage. And what Coeur d'Alene's did is it looked at its records and determined that there was no insurance coverage. It looked at Coeur d'Alene's company's records. It looked at the records that it had received through its merger with Conjecture, Inc., through that merger. And I think it's also important to note that, according to Ms. Schroeder's affidavit, that Coeur d'Alene's does not have any documents from the Fennell & Major mining company. When they did that merger, it was their understanding that they were only obtaining the liabilities of Conjecture, Inc. But when you say that merger, which merger are you talking about? The merger that happened in 1993 with Conjecture, Inc. and Coeur d'Alene's. You're not talking about the Fennell & Major merger with somebody. Yeah, there was some sort of transaction back in the 1950s, the Fennell & Major mining company and with Conjecture, Inc. And what we submit, what Coeur d'Alene submits, is that it is not a successor to Fennell & Major. And that gets to the question or some of the questions that were raised with respect to Coeur d'Alene's tendering demands to letters to this so-called insurance company. And the reason it didn't do that is because what Federal Resources was demanding is that we concede that we were a successor in interest to the Fennell & Major mining company. And Coeur d'Alene has always maintained that it is not. Well, is that the reason you declined to send a tender letter? Yes, Your Honor. That was the reason. Because the way it was drafted was that we were conceding that Fennell & Major were, that we attained their liabilities, and we have disputed that. And then when you look at the insurance that's actually at issue here, and we kind of addressed this in our briefing, that was workers' compensation insurance. There's no evidence that Fennell & Major had any liability insurance. Okay. I guess that gets me back to my question, and maybe it's related to an earlier question Judge Tashima had. Are you asking us to make an exception to the Montrose standard of fairness that we're supposed to consider proportionate liability? And you're saying we need to make an exception to that, that for the ability to pay, that can be the one and only issue that the district court looks at. I don't consider it an exception. I mean, Montrose was following the First Circuit and Cannons. And what Cannons goes into great detail about is that the government is entitled to have some flexibility when it allocates responsibility among potential responsible parties. And I think one of the mechanisms, one of the ways that the United States has to allocate responsibility is through an ability to pay. And I think when you look at the unique circumstances of these cases, and you look at this particular case where the United States investigated how much could Coeur d'Alene's pay, and it was limited to $350,000. That's what it could pay and still maintain itself as a viable business. And when you look at that, at the end of the day, that's all it can pay. Even if you do the comparison. I know the court has to give the double deference. I get that. But if you're paying in the settlement a penny on the dollar, maybe a district court is going to look at your ability to pay evidence a little bit more carefully as opposed to you're paying 99 cents on the dollar. Close is good enough, especially for government work. Yes, and I agree that it does depend on the facts and the unique circumstances of the case. And in this case, we're dealing with $4.3 million that the government was trying to recover. I mean, you have to look at the timing of the settlement, looking at the ability to pay, looking at accountability and responsibility as well. And I think when the United States gathered all that information together, it's entitled to have some deference to it in making this determination based on the ability to pay. At the end of the day, I mean, it is what Coeur d'Alene's can pay. I don't want to put words in your mouth, but the way you just said that, and you look at their liability and that gets into the assessment on whether this is fair because of their ability to pay. So you just put the factor in there that I've been raising. Doesn't the proportionate liability have to go into the analysis? It might be a preliminary estimate. It might have to give deference to it. But isn't that an important factor that a judge needs to look at when you're determining, okay, this is fair given the ability to pay? And again, Your Honor, I think it goes down to the unique facts of the particular case. And I think here the district court was right to defer to the United States given the unique facts of this case with what Coeur d'Alene's company could pay. I mean, it is still being held accountable. It is still being held responsible. And it is replenishing Superfund without, you know, having to go into litigation costs. I mean, that $350,000 could be reduced significantly if we have to litigate, you know, some of these issues that Federal Resources wants us to litigate. Thank you. Thank you. I'll give you one full minute here. Oh, thank you. I'd like to address the successor liability issue. There is evidence, clear evidence, funnel and major documents, where they reaffirmed that Conjecture Mines, Inc. was the successor entity accepting all assets and liabilities to funnel and major mining company. It did this twice. These documents are in the record before you. So it's not just the lawyer who was the lawyer for funnel and major and Conjecture Mines, Inc. for somewhere between 15 and 20 years who wrote to the Federal Government and said we are the successor. It was also funnel and major's historical documents that confirmed this. All of these documents, the government has suggested that it was not on notice of this issue prior to lodging of the consent decree. First of all, these documents are the government's documents. They are at the Spokane office of the USGS, and that is how Federal Resources found them. In fact, we found part of them on the Internet. We had asked for documents that would have included this set of documents in discovery, and we were told go look in the National Archives. So if there is some complaint that the government itself couldn't locate its own evidence, I believe that should be on the government. Finally, the ability to pay policy specifically calls out that it may be necessary for a party to either waive confidential business information so that evidence can be submitted to the court in support of a consent decree or that other mechanisms would have to be put in place, such as a protective order or in-camera review. The point I'd like to make here is that the government and CDA are saying, please trust us. We told you we've looked at insurance, even though the evidence we've submitted says we didn't look at it for funnel and major and Joan Meyer didn't look at it, but please trust us. But it could have actually produced this evidence to the government in a way that's either in-camera or under a protective order so that Federal Resources could see it and the court could see it. And unless the court has any further questions. Thank you. Thank you. Thank you very much for your arguments, very helpful. The case of United States of America versus Coeur d'Alene versus Federal Resources Corporation is now submitted.
judges: Carney, TASHIMA, MURGUIA